# In the United States Court of Federal Claims

**No. 11-86C**
**(Filed: May 4, 2011)\***
**\*OPINION ORIGINALLY FILED UNDER SEAL ON APRIL 29, 2011**

| | |
|---|---|
| * * * * * * * * * * * * * * * * * * | * |
| | * **Bid Protest; 28 U.S.C. § 1491(b)(1);** |
| **SANTA BARBARA APPLIED** | * **In-Sourcing Decision Made "in** |
| **RESEARCH, INC.,** | * **connection with a procurement";** |
| | * **Contract-holder an "Interested Party"** |
| Plaintiff, | * **with Standing to Challenge In-** |
| | * **Sourcing Decision; Prudential** |
| v. | * **Standing Does Not Apply to Bid** |
| | * **Protests; 10 U.S.C. § 129a; 10 U.S.C. §** |
| **THE UNITED STATES,** | * **2463; Ike Skelton National Defense** |
| | * **Authorization Act for Fiscal Year** |
| Defendant. | * **2011, 124 Stat. 4127, 4184.** |
| | * |
| * * * * * * * * * * * * * * * * * * | * |

*Paul F. Khoury,* Washington, DC, for plaintiff. *William A. Robert, III*, *Richard B. O'Keeffe, Jr.*, and *Heidi L. Bourgeois*, Washington, DC, of counsel.

*William P. Rayel,* United States Department of Justice, Washington, DC, with whom were *Tony West,* Assistant Attorney General, and *Jeanne E. Davidson,* Director, for defendant.

**O P I N I O N**

**FIRESTONE**, *Judge*.

Pending before the court are cross-motions for judgment on the administrative record filed under Rule 52.1 of the Rules of the United States Court of Federal Claims ("RCFC") by the plaintiff, Santa Barbara Applied Research, Inc. ("SBAR"), and by the defendant, the United States ("government"), in this challenge to an Air Force decision to in-source work that had been performed by SBAR under an Air Force contract brought

pursuant to 28 U.S.C. § 1491(b)(1), 10 U.S.C. § 129a, and 10 U.S.C. § 2463.  Also

pending before the court is the government's motion to dismiss the plaintiff's claim for

lack of standing under RCFC 12(b)(1), or, in the alternative, under RCFC 12(b)(6) for

failure to state a claim upon which relief may be granted.  For the reasons set forth below,

the court **DENIES** the government's motion to dismiss, **DENIES** the plaintiff's motion

for judgment on the administrative record, and **GRANTS** the government's motion for

judgment on the administrative record.

## I.  STATEMENT OF FACTS

The following facts are taken from the administrative record ("AR").

### A.  SBAR's Contract

On September 24, 2007, the Air Force and SBAR entered into a multi-wing

logistics support ("MWLS") contract, Contract No. FA2517-07-D-6009.  AR 15056.

SBAR's MWLS contract is an indefinite quantity ("IDIQ") contract that allows the Air

Force to issue task orders from certain contract line item numbers ("CLINs") for specific

services and primarily for specific Air Force Bases ("AFBs") on a monthly basis.  AR

15060-346, 15411.  The contract required SBAR to perform MWLS services at nine

locations that are or were within the Air Force Space Command ("AFSPC"):  Buckley

AFB, F.E. Warren AFB, Malmstrom AFB, Minot AFB, Patrick AFB, Peterson AFB,

Schriever AFB, Vandenberg AFB, and the AFSPC Headquarters Logistics Support Center

("HQ LSC").[1]  AR 13736, 13739.  MWLS services support the mission of a base or

command and include fuels management, vehicle operation and maintenance, base

transportation, surface freight operations, and ordering, storing, receiving, handling,

issuing, and maintaining weapons.  AR 13736-927.  The MWLS contract included a one-

month phase-in period, from September 30, 2007 through October 31, 2007, a basic

ordering period from November 1, 2007 through October 31, 2008, and four option

ordering periods from November 1, 2008 through October 31, 2009, November 1, 2009

through October 31, 2010, November 1, 2010 through October 31, 2011, and November 1,

2011 through October 31, 2012.  AR 15390.

### B.  The In-Sourcing Initiative

On January 28, 2008, Congress amended 10 U.S.C. § 2463 to provide that greater

consideration be given to using, on a regular basis, Department of Defense ("DoD")

civilian employees to perform DoD functions.  See National Defense Authorization Act

for Fiscal Year 2008, Pub. L. 110-181, 122 Stat. 3, 60-61 (January 28, 2008).  Specifically,

10 U.S.C. § 2463 as amended includes: 1) a requirement that the Under Secretary of

Defense for Personnel and Readiness "devise and implement guidelines and procedures to

ensure that consideration is given to using, on a regular basis, [DoD] civilian employees to

perform new functions and functions that are performed by contractors and could be

---

[1] Throughout the administrative record, these bases are sometimes referred to by the following
numbers: 1) Buckley AFB = 460th; 2) F.E. Warren AFB = 90th; 3) Malmstrom AFB = 341st; 4)
Minot AFB = 91st; 5) Patrick AFB = 45th; 6) Peterson AFB = 21st; 7) Schriever AFB = 50th;
and 8) Vandenberg AFB = 30th.  See, e.g., AR at 11.

performed by [DoD] civilian employees"; 2) a requirement that the guidelines and procedures give "special consideration" to using DoD civilian employees for certain functions;[2] and 3) a prohibition on conducting public-private competitions for certain functions without first allowing civilian employees to perform those functions.  10 U.S.C. §§ 2463(a)-(c).  On April 4, 2008, the DoD issued "guidelines and procedures" to implement 10 U.S.C. § 2463.  AR 15911-21.

On March 4, 2009, President Obama directed the Office of Management and Budget ("OMB") to issue guidance to assist agencies in identifying contracts that are wasteful, inefficient, or not otherwise likely to meet the agency's needs, and to formulate appropriate corrective action, including modification or cancellation of contracts when appropriate.  AR 15908-10.  On April 8, 2009, the DoD issued Resource Management

---

[2] "Special consideration" is to be given for the following functions:

> [A]ny function that-- (1) is performed by a contractor and--
> > (A) has been performed by [DoD] civilian employees at any time during the previous 10 years;
> > (B) is a function closely associated with the performance of an inherently governmental function;
> > (C) has been performed pursuant to a contract awarded on a non-competitive basis; or
> > (D) has been performed poorly, as determined by a contracting officer during the 5-year period preceding the date of such determination, because of excessive costs or inferior quality; or
> (2) is a new requirement, with particular emphasis given to a new requirement that is similar to a function previously performed by [DoD] civilian employees or is a function closely associated with the performance of an inherently governmental function.

10 U.S.C. § 2463(b).  Neither party has alleged that the functions at issue in this case fall within the parameters of the functions requiring "special consideration."

Decision 802 ("RMD 802"), which realigned resources for the DoD, for fiscal years 2010

through 2014, by decreasing funding for contract support and increasing funding for

civilian manpower authorizations.  AR 15929-30.

On May 28, 2009, the Deputy Secretary of Defense released a guidance document

entitled, "In-sourcing Contracted Services – Implementation Guidance" ("DoD In-

sourcing Implementation Guidance").  AR 15930-47.  The guidance document instructed

the DoD that, when considering conversion candidates, the conversion rationale should

support a minimum of one of the following: 1) the function is inherently governmental; 2)

the function is exempt from private sector performance; 3) the contract is for unauthorized

personal services; 4) there were problems with contract administration on the contract;

and/or 5) a cost analysis shows that DoD civilian performance is more cost effective than

contractor performance.  AR 15934-40.

Following the issuance of the May 28, 2009 guidance document, each major Air

Force command was instructed to identify candidates for in-sourcing.  AR 15948.

Approximately $304 million was deleted from the AFSPC's contract budget and its

civilian pay account was increased by a dollar amount that roughly equated to an increase

of 1,527 civilian employees.  AR 1.  Once each major command had identified candidates

for in-sourcing, they were instructed to ascertain whether the identified contracts were

viable candidates for in-sourcing by using the COMPARE cost calculating tool.  AR

15977.  COMPARE is a DoD costing software program that assists analysts in developing,

documenting, and comparing the relative costs of operating commercial activities by in-

house, other Government agency, or commercial entities for purposes of OMB Circular A-76. AR 15452-53. OMB Circular A-76 provides guidance to federal agencies on the competition of commercial activities, including decisions on whether government personnel or the private sector should perform such activities. See AR 15576.

On January 29, 2010, the DoD published Directive-Type Memorandum 09-007, "Estimating and Comparing the Full Costs of Civilian and Military Manpower and Contract Support" ("DTM 09-007").[3] AR 16030-56. DTM 09-007 established business rules for estimating and comparing costs of Government manpower and contract support. Id. The Air Force subsequently updated the COMPARE database with costing procedures outlined in DTM 09-007; the database is now called "DTM-COMPARE." AR 3-4, 16057.

On January 7, 2011, the Ike Skelton National Defense Authorization Act for Fiscal Year 2011 amended 10 U.S.C. § 2463 as follows:

> Sec. 323 Prohibition On Establishing Goals Or Quotas For Conversion Of Functions To Performance By Department Of Defense Civilian Employees.
>
> (a) Prohibition– The Secretary of Defense may not establish, apply, or enforce any numerical goal, target, or quota for the conversion of Department of Defense functions to performance by Department of Defense civilian employees, unless such goal, target, or quota is based on considered research and anaylsis, as required by section 235, 2330a, or 2463 of title 10, United States Code.
>
> (b) Decisions to Insource– In deciding which functions should be converted to performance by Department of Defense civilian employees pursuant to section 2463 of title 10, United States Code, the Secretary of Defense shall use the costing methodology outlined in the Directive-Type Memorandum 09-007 (Estimating and Comparing the Full Costs of Civilian

---

[3] DoD re-issued DTM 09-007 on October 21, 2010. AR 16030. The only significant change in the re-issued document was to establish that the DTM would expire on September 1, 2011. Id.

> and Military Manpower Contractor Support) or any successor guidance for a
> determination of costs when costs are the sole basis for the decision. The
> Secretary of a military department may issue supplemental guidance to assist
> in such decisions affecting functions of that miliary department.

Ike Skelton National Defense Authorization Act for Fiscal Year 2011 ("Ike Skelton

NDAA"), Pub. L. 111-383, 124 Stat. 4127, 4184 (Jan. 7, 2011).

### C.  The Initial Decision to In-Source the SBAR Contract

In mid-2009, AFSPC began to identify contracts to in-source.  AR 1.  For fiscal

year 2010, AFSPC largely in-sourced contracts closely associated with inherently

governmental activities.  Id.  However, as a result of the magnitude of cuts to the budget

available for contracting for fiscal years 2011 through 2015, AFSPC staff looked beyond

contracts closely associated with inherently governmental activities to contracts that were

common across the AFSPC and contracts that posed the least risk to AFSPC's mission.

AR 1-2.  The AFSPC identified the non-fuels support portion of the MWLS contract as an

in-sourcing candidate for several reasons.  AR 2-3.  First, AFSPC indicated it was having

difficulty finding funds to pay for the contract prior to the in-sourcing initiative.  AR 2.

Second, AFSPC indicated in-sourcing MWLS functions will give commanders more direct

operational control over the personnel performing MWLS services.  AR 2.  More direct

control was specifically identified as important at Malmstrom AFB, F.E. Warren AFB, and

Vandenberg AFB, which have a nuclear mission.  AR 2.  Third, AFSPC indicated it was

having difficulty meeting the requirements of a new Logistics Compliance Assessment

Program, which included performance evaluations on individual employees.  AR 3.

The AFSPC staff briefed the RMD 802 implementation strategy for fiscal years 2011 through 2015, which included in-sourcing the non-fuels portion of the MWLS contract, to the Vice Commander of AFSPC, Major General Michael J. Basla,[4] on or about March 30, 2010.  AR 3, 16205-33.  On April 2, 2010, Major General Basla approved the in-sourcing implementation strategy.  AR 1, 3, 16234.

At that point, each of the nine locations that SBAR serves, the eight bases and HQ LSC, conducted cost analyses, using DTM-COMPARE, to determine whether the cost of civilian performance would be less expensive than the cost of contractor performance.  AR 15, 17428-29, 18234-35, 18802-03, 19382-83, 20040-41, 20699-700, 21457-60, 21793-94, 22725-26.  The AFSPC found these analyses showed a cost savings of more than $31 million contract-wide.  Id.

In June 2010, the Air Force notified SBAR that it was in-sourcing functions under the MWLS contract.  AR 16322.  On or about August 30, 2010, the Air Force provided SBAR with an anticipated schedule for in-sourcing, starting with Minot AFB on September 30, 2010 and ending with Patrick and Peterson AFBs in fiscal year 2012.  Id. Since the June 2010 decision, the non-fuels portions of the MWLS contract have been in-sourced at Buckley AFB, F.E.Warren AFB, Malmstrom AFB, and Minot AFB.  AR 3. The Air Force reports that the bases have experienced some minor transition difficulties, but that "the transitions have gone very well overall."  Id. ("Malmstrom [AFB] has been

---

[4] Major General Basla was subsequently promoted to Lieutenant General.  AR 8.

inspected since transition and, while Logisitics Readiness Squadron had one write-up related to record-keeping, they have been rated in compliance/passing twice and excellent once"), AR 73 (stating that no transition difficulties were noted at F.E. Warren AFB), AR 33 (noting some successes at Buckley AFB as well as [* * *]), AR 108 ("Malmstrom has transitioned and no work stoppages or major difficulties were encountered."), AR 129 (stating that there were "no difficulties, work-stoppages, [or] services limitations . . . that occurred for this transition" at Minot AFB).

### D.  SBAR's Lawsuit and the Air Force's Re-Evaluation of the Decision to In-Source

On February 9, 2011, SBAR filed the present action challenging the Air Force's decision to implement its in-sourcing decision at four bases: Vandenburg AFB, Schriever AFB, Peterson AFB, and Patrick AFB.  SBAR did not challenge the Air Force's decision to in-source MWLS functions at any of the four bases where the transition had already taken place.  Nor did SBAR challenge the in-sourcing decision with respect to HQ LSC.

After the lawsuit was filed, the Air Force voluntarily agreed to re-evaluate its in-sourcing decision based in part on the criticisms raised by SBAR in its complaint. During the re-evaluation period the Air Force agreed that it would not implement its earlier in-sourcing decision with regard to Vandenburg AFB, Schriever AFB, Peterson AFB, and Patrick AFB.

In its re-evaluation of the original cost comparisons between SBAR and civilian employees, the Air Force discovered that there were significant errors in the data and

calculations, including improper inflation rates for contractor performance and improperly including fuels services costs in the contractor price.  AR 3.

As a consequence, the Air Force decided to conduct a new comparison in accordance with DTM 09-007 and other applicable DoD guidance.  AR 1, 3.  The Air Force's stated purpose for the re-evaluation was to "ensure [that] the original decision was correct" and "adequately justified."  Id.  The Air Force performed a new cost comparison at each of the nine locations affected by the MWLS contract using primarily information that was available in April to June 2010, when the original cost comparisons were performed.  AR 7, 13, 20-22, 67-68, 82-83, 103-04, 121-23, 143-45, 160-61, 180-83, 201-03.  Additionally, because new information had become available at some of the locations since the original cost comparisons were run in April to June 2010, the Air Force conducted a second cost comparison at seven of the nine locations.[5]  AR 7, 11, 17-19, 65-66, 101-02, 118-20, 140-42, 158-59, 198-200.

As part of the re-evaluation, AFSPC sent a "Narrative In-sourcing Worksheet" to each of the nine locations asking a number of questions and requesting that each base justify certain DTM-COMPARE inputs, such as the size of the anticipated labor force for the in-sourced work.  See, e.g., AR 69-80.  The locations were instructed to attach documents to the worksheets supporting their statements and calculations.  See, e.g., AR 69.

---

[5] Information for HQ LSC and Schriever AFB did not change.  AR 95, 192.

After each of the locations calculated the costs of agency and government performance using DTM-COMPARE, the Air Force Manpower Agency ("AFMA") reviewed and validated the cost analyses.  AR 7.  AFMA completed its review between April 1, 2011 and April 4, 2011.  Id.  The final cost analyses concluded that, using information that was primarily available in the April to June 2010 time frame, the DoD saves approximately $7.3 million (from 2011 through 2015) by in-sourcing the non-fuels portion of the MWLS contract.  AR 8, 13.  Using currently available information, the final cost analyses concluded that the in-sourcing saves the DoD approximately $8.8 million for that same period.[6]  AR 8, 11.  On April 5, 2011, based upon this re-evaluated cost savings, Lieutenant General Basla confirmed that the decision to in-source the non-fuels portion of the MWLS contract was correct and approved the continued in-sourcing of SBAR's MWLS contract.  AR 8.

## II.  GOVERNMENT'S MOTION TO DISMISS

The government has moved to dismiss SBAR's complaint on the grounds that SBAR does not having standing to challenge the Air Force's decision to in-source and thus this court lacks jurisdiction to hear the case under RCFC 12(b)(1).  The government also moves to dismiss SBAR's complaint on the grounds that SBAR has failed to state a claim for relief under RCFC 12(b)(6).  The government argues that the decision to in-source is

---

[6] At oral argument, the government conceded there was a $255,000 error with respect to its calculation at Malmstrom AFB.  However, the plaintiff did not dispute that this error alone is not enough to tip the balance from the Air Force's final cost savings determination of $8.8 million.

committed to agency discretion as a matter of law and there are no standards to apply.[7]

## A. SBAR Has Standing to Challenge the Air Force's Decision to In-Source

The Tucker Act, 28 U.S.C. § 1491(b)(1), gives the Court of Federal Claims

"jurisdiction to render judgment on an action by an interested party objecting to . . . any

alleged violation of statute or regulation in connection with a procurement or proposed

procurement."  The government concedes that the Court of Federal Claims has jurisdiction

generally to hear challenges to procurement-related decisions, but argues that this case

_____

[7] The standards to be applied in reviewing motions under RCFC 12(b)(1) and 12(b)(6) are well-settled and not in dispute.

    Pursuant to RCFC 12(b)(1), the plaintiff bears the burden of establishing subject matter jurisdiction, Alder Terrace, Inc. v. United States, 161 F.3d 1372, 1377 (Fed. Cir. 1998) (citing McNutt v. General Motors, 298 U.S. 178, 189 (1936)), and must do so by a preponderance of the evidence, Reynolds v. Army & Air Force Exchange Service, 846 F.2d 746, 748 (Fed. Cir. 1988). Because jurisdiction is a threshold matter, a case can proceed no further if a court lacks jurisdiction to hear it.  See Arbaugh v. Y & H Corp., 546 U.S. 500, 514 (2006)  ("[W]hen a federal court concludes that it lacks subject-matter jurisdiction, the court must dismiss the complaint in its entirety." (citation omitted)); Steel Co. v. Citizens for a Better Env't, 523 U.S. 83 (1998).  See generally John R. Sand & Gravel v. United States, 552 U.S. 130 (2008).

    When a party has moved to dismiss for lack of subject matter jurisdiction, the alleged facts in the complaint are viewed as true.  Pixton v. B & B Plastics, Inc., 291 F.3d 1324, 1326 (Fed. Cir. 2002) (citing Scheuer v. Rhodes, 416 U.S. 232, 236 (1974)); see also N. Hartland, L.L.C. v. United States, 309 F. App'x 389, 392 (Fed. Cir. 2009) (the court "takes the allegations in the pleadings as true and construes them in the light most favorable to the complainant"). When a court considers a motion to dismiss for lack of subject matter jurisdiction, it may look beyond the pleadings and "inquire into jurisdictional facts" to determine whether jurisdiction exists. Rocovich v. United States, 933 F.2d 991, 993 (Fed. Cir. 1991).

    To survive a motion to dismiss under RCFC 12(b)(6) for failure to state a claim upon which relief can be granted, the complaint must contain facts sufficient to "'state a claim to relief that is plausible on its face.'"  Ashcroft v. Iqbal, --- U.S. ---, 129 S.Ct. 1937, 1949 (2009) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007)); Colida v. Nokia, Inc., 347 F. App'x 568, 570 (Fed. Cir. 2009) ("the complaint must have sufficient 'facial plausibility' to 'allow[] the court to draw the reasonable inference that the defendant is liable.'" (quoting Iqbal, 129 S.Ct. at 1949)); Acceptance Ins. Cos., Inc. v. United States, 583 F.3d 849, 853 (Fed. Cir. 2009) ("a complaint must allege facts 'plausibly suggesting (not merely consistent with)' a showing of entitlement to relief" (quoting Twombly, 550 U.S. at 557)).

must be dismissed because SBAR does not have standing to bring a challenge to the Air

Force's in-sourcing decision.  The government makes two standing arguments in support

of its motion to dismiss for lack of standing.  First, it argues that SBAR is not an

"interested party" within the meaning of section 1491(b)(1), and therefore it cannot be

heard to complain about the Air Force's in-sourcing decision.  In particular, the

government argues that because this case does not involve a formal public-private

competition SBAR cannot claim it suffered the "competitive injury" allegedly necessary

for standing under section 1491(b)(1) as interpreted by the Federal Circuit in American

Federation of Government Employees, AFL-CIO ("AFGE") v. United States, 258 F.3d

1294 (Fed. Cir. 2001) and modified by Weeks Marine, Inc. v. United States, 575 F.3d

1352 (Fed. Cir. 2009).  Second, the government argues that SBAR fails the Federal Circuit

test for "prudential standing" allegedly established in Galen Medical Associates, Inc. v.

United States, 369 F.3d 1324 (Fed. Cir. 2004), because SBAR is not the intended

beneficiary of the interests protected by 10 U.S.C. § 129a and 10 U.S.C. § 2463, the two

statutes implicated in an in-sourcing decision.  According to the government, the Federal

Circuit in Galen determined that protestors must be both "interested parties" and meet a

prudential standing requirement to maintain an action under section 1491(b)(1).

     SBAR argues that the government's motion to dismiss is without merit.  It argues

that, as the awardee of the current MWLS IDIQ contract with an interest in future contract

work, SBAR is plainly an "interested party" under section 1491(b)(1).  SBAR argues that

"the Air Force's decision to insource the MWLS work has had, and will continue to have,

a direct economic impact on SBAR" and thus it has fully satisfied the standing criteria

established by the Federal Circuit in AFGE and Weeks Marine.  Pl.'s Resp. & Reply 7,

ECF No. 50.  With regard to the government's "prudential standing" argument, SBAR

argues that there is "no separate prudential standing" test in the Federal Circuit.  Id. at 9.

SBAR asserts that Galen merely requires that a plaintiff bringing a protest under section

1491(b)(1) demonstrate that it is economically prejudiced by the government's alleged

error in the procurement-related action.  SBAR contends that it cannot be disputed that it

has been prejudiced – i.e. economically harmed – by the errors they allege the government

committed in making the in-sourcing decision.

      Whether this court has jurisdiction to hear SBAR's challenge to the government's

in-sourcing decision – and whether SBAR has standing to bring that challenge – is a

threshold question that turns on whether the government's in-sourcing decision was made

"in connection with a procurement" within the meaning of section 1491(b)(1) and whether

SBAR is an "interested party" within the meaning of section 1491(b)(1).  There appears to

be no dispute that the Air Force's decision to in-source the work SBAR had been

performing at four Air Force bases and continues to perform at five other locations is a

decision that was made "in connection with a procurement" as that term has been

interpreted by the Federal Circuit.  See Distributed Solutions, Inc. v. United States, 539

F.3d 1340, 1346 (Fed. Cir. 2008) ("[T]he phrase, 'in connection with a procurement or

proposed procurement,' by definition involves a connection with any stage of the federal

contracting acquisition process, including 'the process for determining a need for property

or services.'"). The substance of the Air Force's decision has been to stop procuring services from SBAR and to instead use Air Force civilian employees to do the same work. Thus, the in-sourcing decision in this case was made for the purpose of determining the need for contract services and thus was made "in connection with a procurement decision." For this reason, the court agrees with both the government and SBAR that SBAR has properly invoked the court's 1491(b)(1) jurisdiction.

The court also finds that SBAR is an "interested party" with standing to challenge the in-sourcing decision. In AFGE the Federal Circuit held that standing under section 1491(b)(1), is limited to "interested parties" who, as defined by the Competition in Contracting Act ("CICA"), 31 U.S.C. §§ 3551-3556, are "actual or prospective bidders and offerors whose direct economic interest would be affected by the award of the contract or the failure to award the contract." AFGE, 258 F.3d at 1302. In AFGE, the Federal Circuit determined that federal employees who were likely to lose their jobs based on a government decision to out-source their work to private contractors did not have standing to challenge the out-sourcing decision on the grounds that they were not eligible to bid on government work. As such, they could not meet the "interested party" definition in CICA,[8] which the Federal Circuit determined was engrafted onto section 1491(b)(1).

---

[8] In response to AFGE, Congress amended CICA and provided federal employees with an avenue for review of out-sourcing decisions. See 31 U.S.C. § 3551(2)(B) (defining interested party "with respect to a public-private competition conducted under Office of Management and Budget Circular A-76 with respect to the performance of an activity or function of a Federal agency, or a decision to convert a function performed by Federal employees to private sector performance without a competition under Office of Management and Budget Circular A-76").

Here, in contrast to the parties in AFGE, SBAR has a government contract and claims that it would expect to compete for future government contracts but for the errors made by the Air Force in its in-sourcing decision, which prevents SBAR or any other contractor from performing the functions at issue.  Where, as here, SBAR has a track record of winning contracts for the work that the Air Force is now in-sourcing, the economic impact to SBAR cannot be denied.  This is all that is required for SBAR to satisfy the criteria for standing under section 1491(b)(1).

The court cannot accept the government's contention that section 1491(b)(1) applies only where a party can demonstrate a "non-trivial competitive injury" arising from a violation of a statute or regulation intended to promote competition.  That test was established in Weeks Marine to clarify the harm necessary to demonstrate interested party status in the pre-award bid protest context.  While it is true that the relevant statutes and regulations at issue here, 10 U.S.C. § 2463 and 10 U.S.C. § 129a, do not mandate any kind of formal public-private competition, it is also true that the in-sourcing decision at issue was based on a cost comparison between the cost of using the contractors with the cost of switching to civilian Air Force employees.  Where a protestor stands to lose future work for which it likely would have competed because of alleged errors in the cost comparison mandated by Congress, the protestor should have standing to challenge the decision to in-source.  This court has recognized the right of contractors to challenge decisions under OMB Circular A-76 not to out-source work where the protestors were among those who were selected for cost comparative purposes with the government in-house organization.

See LABAT-Anderson, Inc. v. United States, 65 Fed Cl. 570, 575-76 (2005).  This court

has also allowed potential contractors to challenge decisions to cancel a solicitation and

not to compete work, where the protestor might have won the award.  Indeed, Distributed

Solutions dealt with a situation where the government decided it would not directly

procure certain services from contractors.  This case presents an analogous challenge to a

government decision regarding the desirability of using contractors or civilian personnel.

Like Distributed Solutions and LABAT-Anderson, this case also involves the loss of

future contract work by a protestor with a direct and real economic interest in the

government's decision.  SBAR has met the test for standing under section 1491(b)(1).

          The government's alternative contention that the court should dismiss the case on

"prudential standing" grounds is without merit.  To begin, the court agrees with SBAR that

the concept of "prudential standing" does not apply to bid protests under section

1491(b)(1).  Prudential standing is typically applied to challenges under the Administrative

Procedure Act ("APA") 5 U.S.C. §§ 500 et seq., which has more liberal standing criteria

than those set in section 1491(b)(1).  In AFGE, the Federal Circuit held that is was

rejecting the "less stringent" standing requirements imposed under the APA in favor of the

"interested party" test, based on the definition in CICA.  AFGE, 258 F.3d at 1302.  Under

AFGE, once a party satisfies the more stringent "interested party" test, standing is

established.  In this connection, the court does not read Galen as requiring something more

to establish standing than AFGE required.  Galen requires a protestor to show that it was

prejudiced by an error in the government's decision.  Here, SBAR has alleged that it has

been prejudiced by errors in the government's in-sourcing decision.  Indeed, the errors

SBAR identified were of sufficient concern to the government that it elected to perform a

re-evaluation of its decision and to stay full implementation of its decision until the Air

Force completed its re-evaluation.

The government argues that, regardless of the errors the government may have

committed in making its decision, the court should dismiss SBAR's case because, in

contrast to the protestor in Galen, SBAR has no interests that are protected under 10

U.S.C. § 2463 or 10 U.S.C. § 129a.  According to the government, SBAR is not within the

"zone of interests" protected by these statutes and therefore errors committed by the

government in fulfilling its obligations under those statutes cannot give rise to a claim of

"prejudice."  The court does not agree.  Having satisfied the "interested party" test, SBAR

has established standing.  Moreover, even if "prudential standing" were required, the court

finds that the Ike Skelton NDAA was enacted, at least in part, for the benefit of the

contracting community.  See Ike Skelton NDAA, 124 Stat. at 4184.  The Ike Skelton

NDAA modified 10 U.S.C. § 2463 in January 2011 to prevent the DoD from imposing any

specific quotas or goals on in-sourcing without a considered cost analysis and mandated

that the DoD conduct a specific cost comparison that takes into account the "full costs of

civilian and military manpower" before making any in-sourcing decision, where, as here,

cost alone is the deciding criteria.  Id.  While the government argues that these provisions

and the guidance referenced in the Act, DTM 09-007, do not provide any benefits for

contractors, the provisions clearly prohibit the DoD from arbitrarily removing work from

contractors without a solid analysis.  The court finds that the mandates in Ike Skelton

NDAA are sufficient to provide grounds for review when potential contractors challenge a

procurement-related in this context, and thus SBAR has satisfied any prudential standing

requirement.

### B.  SBAR's Complaint States a Claim for Relief

The government next argues that the decision to in-source is committed to agency

discretion as a matter of law and therefore the decision is not subject to judicial review and

must be dismissed, citing <u>Lincoln v. Vigil</u>, 508 U.S. 182, 191 (1993).  The government

contends that an in-sourcing decision is a budget decision that may be reviewed only by

Congress.  SBAR argues in response that it has stated a claim based on the Air Force's

alleged misapplication of DTM 09-007 and that Congress, by requiring compliance with

the guidance in the Ike Skelton NDAA, has sufficiently circumscribed the Air Force's

discretion to distinguish this case from <u>Lincoln</u>.  Here, SBAR contends, the applicable

statue provides the court with a meaningful standard against which to judge the Air

Force's exercise of discretion.

The court agrees with SBAR.  Contrary to the government's contentions, Congress'

decision to require compliance with DTM 09-007 for in-sourcing decisions based, like this

one, on cost savings alone gives the court a meaningful standard against which to judge

the Air Force's exercise of discretion.  SBAR's complaint, which is based on the alleged

misapplication of DTM 09-007 by the Air Force, states a claim for relief.

## III.  CROSS-MOTIONS FOR JUDGMENT ON THE ADMINISTRATIVE RECORD

### A.  Standard of Review

RCFC 52.1 provides for review based on the administrative record.  Under RCFC 52.1, the court determines whether, given all the disputed and undisputed facts, a party has met its burden of proof based on the evidence in the record.  Bannum, Inc. v. United States, 404 F.3d 1346, 1356 (Fed. Cir. 2005).

The Federal Circuit has held that the proper standard to be applied in claims brought under 28 U.S.C. § 1491(b)(1) is provided by the APA, 5 U.S.C. § 706(2)(A) (2006): "a reviewing court shall set aside the agency action if it is 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.'"  Banknote Corp. of Am. v. United States, 365 F.3d 1345, 1350-51 (Fed. Cir. 2004) (quoting 5 U.S.C. § 706(2)(A); citing Advanced Data Concepts, Inc. v. United States, 216 F.3d 1054, 1057-58 (Fed. Cir. 2000)); 28 U.S.C. § 1491(b)(4) (2000).  Under this standard, a procurement decision may be set aside if either:

> (1) the procurement official's decision lacked a rational basis; or (2) the procurement procedure involved a violation of regulation or procedure. A court evaluating a challenge on the first ground must determine whether the contracting agency provided a coherent and reasonable explanation of its exercise of discretion. When a challenge is brought on the second ground, the disappointed bidder must show a clear and prejudicial violation of applicable statutes or regulations.

Axiom Res. Mgmt., Inc. v. United States, 564 F.3d 1374, 1381 (Fed. Cir. 2009) (quoting Impresa Construzioni Geom. Domenici Garufi v. United States, 238 F.3d 1324, 1332-33

(Fed. Cir. 2001)) (internal quotation omitted).  "The scope of review under the 'arbitrary and capricious' standard is narrow and a court is not to substitute its judgment for that of the agency."  Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto Ins. Co., 463 U.S. 29, 43 (1983); Ala. Aircraft Indus., Inc.-Birmingham v. United States, 586 F.3d 1372, 1375 (Fed. Cir. 2009).

### B.  The Air Force's Decision to Compare Cost Data from All Nine Contract Locations When Re-Evaluating Its In-Sourcing Decision Was Not Arbitrary and Capricious.

As an initial matter, SBAR challenges the Air Force's decision to re-evaluate and revise its cost analysis based on the entire non-fuels portion of SBAR's MWLS contract. SBAR does not dispute that the deciding factor in the original decision to in-source, as directed by the DoD In-sourcing Implementation Guidance,[9] was based on a cost analysis comparing the cost of contractor performance of all non-fuels MWLS functions to the cost of DoD civilian performance of the same MWLS functions.  SBAR also does not dispute that the original cost analysis contained errors, which warranted the Air Force's re-evaluation of its original decision to in-source.  However, SBAR argues that the Air Force

---

[9] Where, as here, the functions to be in-sourced are not alleged to be inherently governmental, exempted from private sector performance, or to be given "special consideration" for in-sourcing in accordance with 10 U.S.C. § 2463, and there are no legal, regulatory, or procedural impediments to using DoD civilian employees to perform the work, the DoD In-sourcing Implementation Guidance directs that "a cost analysis be conducted to determine whether DoD civilian employees or the private sector would be the most cost effective provider."  See AR 15935-40.  When conducting cost analyses, DoD components must comply with DTM 09-007. AR 15940; see also Ike Skelton NDAA, 124 Stat. at 4184 ("when costs are the sole basis for the decision" to in-source pursuant to 10 U.S.C. § 2463, DoD shall "use the costing methodology in [DTM 09-007] or any successor guidance for determination of costs").

should only have focused its re-evaluation on the four bases (Patrick AFB, Peterson AFB, Schriever AFB, and Vandenberg AFB), where non-fuels MWLS functions have not yet been in-sourced, and contends that the Air Force's decision to include all of the other locations in its revised cost analysis was arbitrary and capricious.  The government argues that because the Air Force made the initial in-sourcing decision based on the combined savings from all bases it was not irrational for the Air Force to re-evaluate its cost-analysis and revisit its decision with respect to all of the locations affected by the in-sourcing decision.

The court agrees with the government.  The Air Force made the in-sourcing decision based on the cost savings that would be realized from in-sourcing the entire non-fuels MWLS contract.  As such, the Air Force could not know whether the decision to in-source was supported without including Buckley AFB, F.E. Warren AFB, Malmstrom AFB, Minot AFB, or HQ LSC in its revised analysis.  The fact that the plaintiff does not have an objection to the in-sourcing decision at the first four bases does not mean that the Air Force could ignore errors in its analysis with regard to those bases.  Because the Air Force made the in-sourcing decision based on an evaluation of cost savings at all locations with regard to the entire non-fuels MWLS contract, the court finds that the Air Force decision to include Buckley AFB, F.E. Warren AFB, Malmstrom AFB, Minot AFB, and HQ LSC[10] in its revised in-sourcing cost analysis was not irrational and the Air Force

---

[10] The plaintiff argues that HQ LSC was not a part of the overall decision to in-source the MWLS functions, because, as noted in an E-mail the functions were slated to be moved to a different Air Force location, see AR 11075 ("the AFSPC/LSC was slated to move to AFGLSC").  However,

cannot be faulted for not limiting its re-evaluation to the four bases of concern to SBAR.

### C. The Air Force's Allocation of Fewer DoD Civilian Employees to Perform MWLS Functions Than That Requested by the Nine Contract Locations Was Not Arbitrary and Capricious.

The plaintiff challenges the Air Force's in-sourcing cost analysis arguing that the Air Force command arbitrarily reduced the number of civilian employees the bases had initially estimated were necessary to perform MWLS functions to about eighty percent of the staff levels requested by the units serviced by the contract. SBAR argues that the decision to reduce the number of positions was not based on any analysis of the number of people actually required to perform the work, but was simply the result of a staffing target established independent of and prior to any cost analysis "due to the fact that HQ AFSPC did not have the number of personnel positions to fully accommodate initial unit requests." Pl.'s Mot. 16-17, ECF No. 39 (quoting AR 4). In support of this argument, the plaintiff references communications related to the Air Force's implementation of RMD 802, which realigned resources for the DoD by decreasing funding for contract support and increasing funding for civilian manpower authorizations. See AR 16404 (February 2010 E-mail

---

that same E-mail goes on to state that because the work was being in-sourced from a contract, the MWLS contract, the Air Force would still need to perform a cost analysis of contract cost versus DoD civilian cost. See id. ("AFSPC/LSC was slated to move to AFGLSC, AFSPC did not in-source that portion of the contract. AFSPC/JA has indicated even though the AFSPC/LSC was not in-sourced the fact the work is moving to AFGLSC an in-house organization they still need to show a cost comparison, contract cost verses [sic] gov cost."). Though the E-mail uses the language, "AFSPC did not in-source that portion of the contract" and, "even though the AFSPC/LSC was not in-sourced," when read in context with the "need to perform a cost analysis of contract cost verses [sic] gov cost," it is clear that the work was being in-sourced from contractor performance to DoD civilian performance, regardless of whether the work would ultimately be performed at a different Air Force location. See id.

noting AFSPC's RMD 802 realignment plan "calls for hiring 1,865 [civilians] by FY14 - Average return for most units is 75% (7.5 [civilians] for every 10 contract FTEs[11]) [80% return for Multi Wing Logistics . . . ]"); 16406 (AFSPC slide noting MWLS contract would be staffed at eighty percent); 17656 (August 2009 E-mail noting in context of RMD 802 realignment that AFSPC expected "the number of FTE requests to exceed the number of civilians allocated to AFSPC; therefore the group will be compelled to make some difficult decisions").  According to the plaintiff, if the Air Force had performed its cost estimate using the number of the staff requested by the nine locations served by the contract, the correction would increase the Air Force's costs more than the Air Force's final cost savings determination of $8.8 million such that continuing to contract out the work would be the least costly alternative.  See Jackson Decl., Exs. 2, 8.  The plaintiff argues that the failure of the Air Force to make that correction prejudices the plaintiff.

The government acknowledges that the initial staffing estimates of the contract locations were generally reduced to eighty percent, but argues that the Air Force's staffing estimates are not arbitrarily low and the bases were able to devise in-sourcing plans with the staffing numbers they were provided.  The government argues that the plaintiff's argument fails to recognize the explanations provided by each location for how they intend to accomplish the MWLS functions with the number of DoD civilian personnel they used to estimate the cost of in-sourced performance.  Further, the government contends that

---

[11] Government manpower authorizations are generally described in terms of full-time equivalents ("FTEs").

when a location did not receive its initial staffing request, the Air Force considered appeals from those decisions and locations were able to successfully negotiate for the minimum manpower necessary to perform MWLS functions at their bases.  See AR 4.  In addition, the government argues that SBAR does not account for the fact that the bases were also able to reallocate personnel positions that were used for quality assurance evaluators to MWLS functions because the Air Force determined that quality assurance evaluators would not be required after the MWLS functions were in-sourced.  See AR 4, 25, 73, 163, 188, 205.  The government also contends that the plaintiff's argument incorrectly assumes that the initial staffing estimates are the actual minimum staffing levels required to accomplish the MWLS functions.

The court finds that the in-sourcing evaluation was not irrational simply because the Air Force cut back on the number of civilian personnel the bases were allocated for performing MWLS functions.  As the government notes, the critical question is whether the Air Force was able to reasonably demonstrate that it could perform the MWLS functions with the staff they were allotted.  Here, each base was required to and did provide a narrative explanation of its ability to perform all in-sourced MWLS functions with the staff allotted, see AR 25-28 (Buckley AFB), 69-70 (F.E. Warren AFB), 85-89 (HQ LSC), 106-07 (Malmstrom AFB), 125-26 (Minot AFB), 147-48 (Patrick AFB), 163-64, 175 (Peterson AFB), 185-86 (Schriever AFB), 205-07 (Vandenburg AFB).  Each base also provided matrices tracing the requirements for the in-sourced work to the new in-

sourced positions.[12]  See AR 9836-39 (F.E. Warren AFB), 11035-36 (HQ LSC), 11161-66

(Malmstrom AFB), 11378-86 (Minot AFB), 11478-541 (Patrick AFB), 12269-73

(Peterson AFB), 13457-58 (Schriever AFB), 13564-67 (Vandenburg AFB).  The plaintiff

has not in any of these instances specifically challenged that the work cannot be done by

the number of DoD civilian employees assigned to perform the MWLS functions by the

Air Force.  Additionally, of particular significance in this case, the re-evaluation

conducted by the Air Force of its cost analysis came after the MWLS functions at four of

the nine locations in question had been in-sourced.  The undisputed record shows that "the

transitions have gone very well overall," and that the civilian Air Force employees have

been able to perform the tasks that SBAR had performed.  See AR 3, 108 ("Malmstrom

[AFB] has been inspected since transition and, while Logisitics Readiness Squadron had

one write-up related to record-keeping, they have been rated in compliance/passing twice

and excellent once"); AR 73 (stating that no transition difficulties were noted at F.E.

Warren AFB); AR 33 (noting some successes at Buckley AFB as well as [* * *]); AR 108

("Malmstrom has transitioned and no work stoppages or major difficulties were

encountered."); AR 129 (stating that there were "no difficulties, work-stoppages, [or]

services limitations . . . that occurred for this transition" at Minot AFB).

    Based on the record, the court finds that the Air Force's decision to reduce staffing

---

[12] Each unit also provided organizational charts showing how the in-sourced workforce would fit
into the unit's existing organization.  See AR 8707 (Buckley AFB), 9901-03 (F.E. Warren AFB),
11077-83 (HQ LSC), 11289 (Malmstrom AFB), 11414-15 (Minot AFB), 11542-50 (Patrick
AFB), 12274-81 (Peterson AFB), 13503 (Schriever AFB), 13681 (Vandenburg AFB).

requests before performing the cost comparison did not result in an irrational evaluation because the bases demonstrated through their narrative explanations and graphical depictions that they could perform the in-sourced MWLS functions with the resources they were given.  This has been confirmed by the successful transitions that have taken place at the first four units.  The fact that the Air Force conducted its cost analysis using the reduced DoD civilian staffing estimates in its in-sourcing cost analysis did not render the decision arbitrary or capricious, where as here, the record demonstrates that the MWLS work can be and is being ably performed by the staffing the Air Force authorized.

### D.  The Air Force's Use of DTM-COMPARE to Account for Overtime Risk Was Not Arbitrary and Capricious.

The plaintiff alleges that the Air Force's cost analysis is irrational because there is no indication in the record that the risk of overtime impact on labor costs was included in the Air Force's estimate of the cost of performance of MWLS services by DoD civilian employees.  The plaintiff focuses its argument on the Narratives In-sourcing Cost Worksheets produced by each contract location, in which the question, "Will your government workforce incur overtime costs or costs associated with mission surges, beyond the normal wage or salary?" was crossed out and left unanswered.  See, e.g., AR 11469.  According to the plaintiff, the inclusion of a 1.5% overtime impact cost at all nine locations served by the contract would reduce the Air Force's cost savings determination by approximately $2.5 million.  See Jackson Decl., Exs. 6, 8.  While such a correction is not sufficient on its own to tip the balance from the Air Force's final cost savings

determination of approximately $8.8 million, if coupled with other alleged errors, the plaintiff alleges the total error might change the Air Force's final cost savings determination such that contracting is the least costly alternative and thereby demonstrate prejudice to the plaintiff.

The defendant argues that the plaintiff is incorrect that the Air Force failed to include an overtime impact cost in its cost analysis, and that the Air Force's use of DTM-COMPARE to account for the risk of overtime costs was appropriate. The defendant points to record evidence that in following the rules and procedures detailed in DTM 09-007, the Air Force accounted for the risk of overtime costs by inflating personnel costs by 3.02% for "Title 38 Medical Premium Pay," "<u>Overtime</u>/Holiday/Other Pays," and "Incentive/Performance Awards." AR 16039, 16049 (emphasis added). The defendant explains that the existence, and subsequent removal, of the overtime question in the Narratives In-sourcing Cost Worksheets was the result of a realization after the initial drafting of the Worksheets that, pursuant to DTM 07-009, overtime costs were already accounted for as part of the "fringe factor" for personnel costs.

The plaintiff acknowledges:

[A]ll the COMPARE analyses used 31.57% as the "Civilian Position Full Fringe Benefit Cost Factor." The fringe factor of 31.57% was calculated from DTM 09-007 by adding the USAF factor of 28.4%, the 3.02% factor listed for Title 38 Medical Premium Pay and Overtime/Holiday Pay in DTM 09-007, and the .15% factor for severance pay and a severance health benefit also listed in DTM 09-007.

<u>See</u> Jackson Decl. ¶ 20. However, the plaintiff argues, in light of the reduced DoD

civilian staff estimates used by the Air Force in its cost analysis that it was irrational for the Air Force to account only for the standard level of overtime costs.  According to SBAR, more overtime would have to be incurred to meet the bases' needs.

The record shows, as the government argues, that the Air Force utilized DTM-COMPARE in performing its cost analysis and that DTM-COMPARE incorporates overtime costs as part of the "fringe factor" for personnel costs.  The court has rejected the plaintiff's contention that the MWLS functions are not being adequately supported by the DoD civilian personnel available, and therefore does not accept SBAR's contention that more overtime is inherently necessary.  The Air Force's failure to add in more overtime costs than already included in the DTM 09-007 for the staffing numbers used in the cost analysis was not irrational.  Accordingly, the court finds that the Air Force's use of the DTM-COMPARE formula to account for the risk of overtime costs was not arbitrary and capricious.

### E.  The Air Force's Use of Full Costs to DoD Rather Than Full Costs to the Federal Government in Estimating the Cost of In-Sourcing from SBAR to DoD Civilian Employees Was Not Arbitrary and Capricious.

The plaintiff alleges that the Air Force, in conducting its cost comparison, misapplied DTM 09-007 by failing to account for the full costs to the Federal Government in conducting its cost comparison.  SBAR argues that 10 U.S.C. § 129a, the DoD Implementation Guidance for in-sourcing, and DTM 09-007 must be read as requiring the Air Force to account for the full costs to the Federal Government when performing a cost analysis on whether to in-source services from a contract service provider to DoD civilian

employees and that the Air Force erred in this case when it accounted only for the full

costs to DoD.  See 10 U.S.C. § 129a ("The Secretary of Defense shall use the least costly

form of personnel consistent with military requirements and other needs of the

Department."); Implementation Guidance, AR 15938 ("a cost analysis must show that

DoD civilian employees would perform the functions more cost effectively"); DTM 09-

007, AR 16031 (noting it is DoD policy that "Defense officials are aware of the full costs

of manpower and have a thorough understanding of the implications of those costs to the

[DoD] and, on a broader scale, to the Federal Government when . . . making program

commitments").

The plaintiff contends based on its reading of DTM 09-007 that had the Air Force

analyzed the full costs to the Federal Government from in-sourcing, including the costs to

the Department of Treasury of an estimated 10% of each employee's base pay with locality

adjustment, the calculated cost savings attributed to in-sourcing would have been greatly

diminished.  See AR 16042 (When accounting for full costs to the Federal government of

civilian personnel, "costs that must be taken into account include Department of Treasury

contributions to the unfunded portion of the civilian retirement fund and to the annuitant

health and life insurance benefits."); AR 16049 (estimating these Treasury costs to be

10%).  According to the plaintiff, the inclusion of these costs at all nine locations served

by the contract would reduce the Air Force's cost savings determination by approximately

$7.9 million.  See Jackson Decl., Ex. 8.  While such a correction is not sufficient on its

own to tip the balance from the Air Force's final cost savings determination of

approximately $8.8 million, if coupled with other alleged errors, the plaintiff alleges the total error might change the Air Force's final cost savings determination such that contracting is the least costly alternative and thereby demonstrate prejudice to the plaintiff.

The government argues that the Air Force's use of full costs to the DoD, rather than full costs to the Federal Government, of DoD civilian employee performance of MWLS services was in accordance with DTM 09-007.  In support of this argument, the government notes that the Air Force was required to follow DTM 09-007 when it conducted its re-evaluation, because costs were the sole basis for the final in-sourcing decision.  See Ike Skelton NDAA, 124 Stat. at 4184 ("when costs are the sole basis for the decision" to in-source pursuant to 10 U.S.C. § 2463, DoD shall "use the costing methodology in [DTM 09-007] or any successor guidance for determination of costs").  The government argues that under the circumstances present in this case, a decision to in-source based on a comparison of the cost of performance of MWLS services by a service contractor and the cost of performance by DoD civilian manpower required the Air Force only to consider full costs to the DoD.  See AR 16043.

The court agrees with the government.  Congress has instructed the DoD, when costs are the sole basis of its decision to in-source pursuant to 10 U.S.C. § 2463, to use the costing methodology in DTM 09-007.  Ike Skelton NDAA, 124 Stat. at 4184.  Under the general provisions of DTM 09-007 Attachment 2, "[m]anpower cost estimates normally address costs to the Department of Defense."  AR 16034.  However, DTM 09-007 recognizes that in certain circumstances full manpower costs to the Federal Government

must be considered.  Id.; see also AR 16036 ("Direct labor costs for military and DoD civilian manpower can be divided into two categories: costs paid by the Department of Defense and costs paid by other Federal agencies."); AR 16041 (manpower costs "can be accounted for in four ways, each applicable in different situations.").  DTM 09-007 Attachment 2 provides instruction on which situations are applicable to which method of accounting.  For instance, full costs to the DoD and full costs to the Federal Government must be used when comparing the costs of manpower conversions between military and DoD civilian employees.  AR 16043 ("When comparing the costs of military and DoD civilian manpower . . . all cost elements in subparagraph 3.a.(3) of this attachment should be considered in determining the full costs to the Department of Defense and all costs elements in subparagraph 3.a.(4) of this attachment should be considered in determining the full costs to the Federal Government").  However, when comparing the cost of DoD manpower (military or civilian) to service contracts DTM 09-007 provides, "the full costs to the [DoD] are considered and only common costs[13] are excluded."  AR 16043 ("When estimating the full costs of DoD manpower, all of the cost elements in subparagraphs

---

[13] "Common costs" are costs that are borne by the DoD regardless of the provider (military, DoD civilian, or private-sector contractor).  AR 16056.

2.b.(2)[14] and 3.c.(3)[15] of this attachment should be considered and only common costs excluded.").

The text of DTM 09-007 plainly states that the in-sourcing comparison only considers the full costs to the DoD. SBAR's argument that the language in DTM 09-007 instructing the Air Force to consider "full costs to the [DoD]" in the context of an in-sourcing cost analysis does not necessarily mean that the Air Force is not also required to consider full costs to the Federal Government is unavailing. Moreover, even if the court

---

[14] Subparagraph 2.b.(2) provides that the full cost of service contract includes "the costs of goods, services, and benefits provided in-kind to contractors or reimbursed to contractors by the DoD, plus the costs of services performed by the DoD in support of the contract."  AR 16040 (emphasis added).

[15] Subparagraph 3.c.(3) provides for the following "miscellaneous" costs:

> (a) Any other significant costs associated with converting from contract to Government performance, as discussed in paragraph 2.b. of this attachment, that are not common costs should be included in the cost estimate. Such costs might include a phase-in or transition plan, training costs, relocation costs (for Federal civilians only), or other costs not common to both alternatives.
> (b) Reference (e) prohibits contractors from receiving an advantage for proposals that reduce costs to the Department of Defense in a public-private competition by: not making an employer-sponsored health insurance plan, health savings account, or medical savings account available to workers who would be employed to perform the function under the contract; offering to such workers an employer-sponsored health benefits plan that requires the employer to contribute less toward the premium or subscription share than the amount that the Department of Defense pays for health benefits for civilian employees pursuant to chapter 89 of title 5, U.S.C., (Reference (m)); or offering such workers a retirement benefit that, in any year, costs less than the annual retirement cost element applicable to DoD civilian employees pursuant to chapter 84 of Reference (m). Where possible and appropriate, cost analysts should make adjustments to the full costs of a service contract by adding an amount equivalent to the amount borne by the Government (as listed in Attachment 4) to the contract's cost.

AR 16044.

were to agree with SBAR that considering full costs to the federal government might make for a more comprehensive comparison for government decision makers, applying full costs to the federal government alone would not change the outcome in this case.

In sum, where a DoD component has made a decision to in-source a service contract to DoD civilian performance pursuant to 10 U.S.C. § 2463 on the basis of cost alone, it must use the methodology set forth in DTM 09-007, and that methodology instructs that a DoD component need only account for full costs to the DoD in its cost analysis. The Air Force's decision to comply with that methodology in estimating the cost savings of its decision to in-source non-fuel MWLS services from performance by SBAR to performance by DoD civilian employees was therefore not arbitrary and capricious.

**F. The Air Force's Inclusion of Quality Assurance Evaluators in the Cost of Contractor Performance and Exclusion of Quality Assurance Evaluators in the Cost of DoD Civilian Performance Was Not Arbitrary and Capricious.**

The record demonstrates that the government included Quality Assurance Evaluators ("QAEs") in the cost of contractor performance and excluded QAEs in the cost of DoD civilian performance in its in-sourcing cost analysis. The plaintiff argues that under OMB Circular A-76 QAEs are common costs and are not to be included in either the cost of contract performance or the cost of government performance, see AR 15510, and therefore the Air Force's inclusion of those costs in its cost analysis was inconsistent with the applicable guidance and thus arbitrary and capricious. According to the plaintiff, removing the QAE costs from SBAR's side of the ledger would reduce the Air Force's cost savings determination by approximately $6.4 million. See Jackson Decl., Exs. 5, 8.

While such a correction is not sufficient on its own to tip the balance from the Air Force's final cost savings determination of approximately $8.8 million, if coupled with other alleged errors, the plaintiff alleges the total error might change the Air Force's final cost savings determination such that contracting is the least costly alternative and thereby demonstrate prejudice to the plaintiff.[16]

The government argues that in the context of calculating QAE there is a relevant distinction between in-sourcing and an A-76 competition, and therefore it was not arbitrary and capricious for the Air Force to include QAE costs in the cost of contractor performance and exclude QAEs in the cost of DoD civilian performance in its in-sourcing cost analysis.  In brief, the government explains that quality assurance, as distinct from quality control, is not part of in-sourcing costs, but is only a cost where an outside contractor is used.  The government observes that unlike an in-sourcing analysis, where the in-sourced work is to be integrated into a federal agency (and quality assurance is part of each supervisor's responsibility), an A-76 competition requires the creation of a Most Efficient Organization ("MEO"), to compete with private entities and requires each to create a "Quality Assurance Surveillance Plan," "which identifies the methods the government will use to measure the performance of the service provider against the

---

[16] SBAR has withdrawn its related argument that individuals currently performing QAE functions who will become part of the in-sourced workforce were not included in the cost calculations.  See Pl.'s Resp. & Reply 25 n.5, ECF No. 50.

requirements of the PWS."[17]  AR 15592, AR 15624 (noting in the A-76 context that "[a]n agency shall not include the cost of surveillance performed by [QAEs], as required by the quality assurance surveillance plan . . . since these are common costs regardless of the source of the selected service provider").

The court agrees with the government.  It is not necessary for the Air Force to follow OMB Circular A-76 with regard to quality assurance in connection with an in-sourcing cost comparison.  The court agrees that quality assurance is not a cost to the agency once the agency has in-sourced the work (as opposed to quality control costs, which have been accounted for) but is a cost when an outside party is undertaking the work.  Accordingly, the court finds that it was not irrational for the Air Force to include QAE costs in the cost of contractor performance, while excluding QAE costs from DoD civilian performance in its cost analysis.

### G.  The Air Force's Use of DTM-COMPARE to Account for Contract Administration Costs at Each Location Was Not Arbitrary and Capricious.

The record shows that the government utilized DTM-COMPARE in performing its

---

[17] A Performance Work Statement ("PWS") is defined as follows:

> A statement in the solicitation that identifies the technical, functional, and performance characteristics of the agency's requirements. The PWS is performance-based and describes the agency's needs (the "what"), not specific methods for meeting those needs (the "how"). The PWS identifies essential outcomes to be achieved, specifies the agency's required performance standards, and specifies the location, units, quality and timeliness of the work.

AR 15636.

cost analysis and that DTM-COMPARE derives contract administration costs[18] on a

sliding scale based on the total number of FTEs estimated for the in-sourced labor force in

accordance with OMB Circular A-76.  See AR 15625.  The plaintiff argues that it was

irrational for the Air Force to utilize the DTM-COMPARE software, rather than historical

cost data, in accounting for contract administration costs, when it performed its revised in-

sourcing cost analysis of the future costs of performance of the MWLS functions.  The

government argues that use of DTM-COMPARE is rational and that the Air Force was not

obligated to rely on historical contract administration costs in conducting its cost analysis.

The court agrees with the government.  While OMB Circular A-76 recognizes that

agencies may seek deviations from DTM-COMPARE, see AR 15577, the plaintiff does

not provide evidence that agencies must deviate or even consider deviating from the

standard protocol during an in-sourcing cost analysis.  See id. ("Agencies are encouraged

to use this deviation procedure to explore innovative alternatives to standard or

streamlined competitions, including public-private partnerships, public-public

partnerships, and high performing organizations." (emphasis added)).  The court finds that

the Air Force's decision to use DTM-COMPARE to account for the cost of contract

administration in its in-sourcing cost analysis was therefore not arbitrary and capricious.

---

[18] Contract administration costs "account for a full range of labor and non-labor requirements for
contract administration [and] include the costs associated with reviewing compliance with the
terms of the contract, processing payments, negotiating change orders, and monitoring the
closeout of contract operations." AR 15624-25; see also AR 16040 ("costs incurred by the
Department of Defense for contract administration and oversight [include] the costs of the
contracting officer (CO), contracting officer's representative (COR), and supplies, equipment,
transportation, etc.").

The plaintiff further argues that even if the Air Force reasonably relied upon the DTM-COMPARE software in its cost-analysis, it was irrational to determine contract administration costs on a location-by-location basis.  According to the plaintiff, performing the DTM-COMPARE analysis on a contract-wide basis, rather than a location-by-location basis would reduce the Air Force's cost savings determination by approximately $3.8 million.  See Jackson Decl., Exs. 7, 8.  While, once again, such a correction is not sufficient on its own to tip the balance from the Air Force's final cost savings determination of approximately $8.8 million, if coupled with other alleged errors, the plaintiff alleges the total error might change the Air Force's final cost savings determination such that contracting is the least costly alternative and thereby demonstrate prejudice to the plaintiff.  The government argues that because SBAR's MWLS contract is an indefinite quantity contract with separate task orders for each of the nine locations administered at the base level it was rational for the Air Force to account for contract administration costs separately for each of the locations.

The court agrees with the government.  While the court recognizes that there may be a variety of ways to supervise a contract across many bases, where, as here, the Air Force has contracted for an indefinite quantity of services to be performed at the base level, it is not irrational for the Air Force to anticipate and account for contract administration costs at the base level.  Accordingly, the court finds that the Air Force's use of DTM-COMPARE to account for contract administration costs at each contract location was not arbitrary and capricious.

IV.     **CONCLUSION**

For the foregoing reasons, the government's motion to dismiss is **DENIED**, the plaintiff's motion for judgment on the administrative record is **DENIED**, and the government's cross-motion for judgment on the administrative record is **GRANTED**.

**IT IS SO ORDERED.**

s/Nancy B. Firestone
NANCY B. FIRESTONE
Judge